**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| vs. | Case No. 15-10130-03-EFM |
| OMAR ORTEGA, | |
| *Defendant.* | |

**MEMORANDUM AND ORDER**

Defendant Omar Ortega was arrested at his home in Keyes, Oklahoma on December 17, 2015, as part of a DEA investigation.  Mr. Ortega, whose primary language is Spanish, speaks and understands very little English.  The DEA arrested Ortega and transported him to the local police station, where the parties met with an interpreter.  The interpreter read the arrest warrant to Ortega, and told him it would be best if he cooperated and told the truth.  At the DEA's request, the interpreter read Ortega each of his *Miranda* rights in Spanish.  After reading him his rights, the interpreter asked if Ortega understood, to which Ortega responded that he did.  The interpreter then asked Ortega if he would like to answer some questions.  Ortega replied: "I have nothing to hide, I have done nothing wrong."  At that point, the DEA agents proceeded to interrogate Ortega in both Keyes, Oklahoma, and later in Dodge City, Kansas.

Ortega now claims that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights, and he seeks to have statements made during his subsequent interrogations suppressed.  The Court finds that the government has proved by a preponderance of the evidence that Ortega heard and understood the *Miranda* warning provided to him and then voluntarily spoke with investigators.  Accordingly, the Court denies Ortega's motion to suppress (Doc. 55).

## I.    Factual and Procedural Background

In 2015, the DEA began intercepting calls under a wiretap of the phone of Jose Alaniz-Hernandez as part of a drug-related investigation.   The DEA recorded phone conversations between Alaniz-Hernandez and Defendant Omar Ortega.  The Grand Jury indicted Jose Alaniz-Hernandez and Anna Noriega-Perez on August 28, 2015.  After reviewing the recorded phone conversations, the Grand Jury indicted Defendant Omar Ortega on December 16, 2015.  Ortega was charged with using a telephone to facilitate a felony and attempting to possess, with the intent to distribute, 50 grams or more of methamphetamine under 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

Three DEA agents, armed with an arrest warrant, arrested Ortega on December 17 at his home in Keyes, Oklahoma.  The group was led by Special Agent Erik Brown, who testified about the investigation, Ortega's arrest, and the subsequent interrogations.  Special Agent Brown speaks very little Spanish, but he does know the phrase: "You have an arrest warrant," which he communicated to Ortega at the time of his arrest.

At 6:40 p.m. the agents transferred Ortega to the local police station for questioning. There, at the station, the agents met with Mary Serna, a certified Spanish interpreter.  She agreed to act as an interpreter for the questioning.  First, the agents provided Serna with the arrest warrant.  She explained the warrant to Ortega in Spanish and informed him why he was in

custody.   The agents then asked Serna to tell Ortega "they had recordings of a conversation [Ortega and Alaniz-Hernandez] had . . . concerning drugs."   She did so, and he responded "that he wanted to hear the recordings."

Serna then provided Ortega with some advice of her own.   Essentially, she told him that it would be best if he cooperated and told the truth.   During this initial conversation, Ortega also stated that he only knew Alaniz-Hernandez because he had done construction work for Alaniz-Hernandez at his house.

At approximately 6:45, Special Agent Brown then provided Serna with a card derived from the *Miranda* rule, known as a "DEA-13A."   One side of the card states, in English:

> Before we ask you any questions, you must understand:
> - You have the right to remain silent.
> - Anything you say can be used against you in court.
> - You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
> - If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> Do you understand?
> Are you willing to answer some questions?

The reverse of the card reads exactly the same, albeit in Spanish.

Serna testified that she read the Spanish side of the card to Ortega, pausing briefly after each line.   She asked him if he understood his *Miranda* rights, to which he "said yes."   Then she read the final line, asking Ortega if he was willing to answer some questions.   Ortega replied: "I have nothing to hide, I have done nothing wrong."   Serna then informed the agents that Ortega understood his rights and that he would answer questions.   Special Agent Brown understood this to mean that Ortega was waiving his *Miranda* rights.

While Serna was reading Ortega his *Miranda* rights, she noticed that Ortega was making eye contact with her and moving his head.   She did not believe Ortega had any problems

communicating with her.  Special Agent Brown testified that, from his perspective, it appeared as though Ortega and Serna "were having open communication."  Ortega did not provide any indication to Serna or the agents that he did not understand.  He never stopped Serna to ask her to repeat one of the rights.  None of the testifying witnesses believed that he was under the influence of drugs or alcohol.  And, finally, Ortega was unrestrained during this exchange.

The agents proceeded to question Ortega for approximately fifteen minutes.  Through the interpreter, the agents briefly described their investigation as it related to him and his recorded phone conversations with co-defendant Jose Alaniz-Hernandez.  Ortega claimed he had no knowledge of any drug activity, but did admit that he knew Alaniz-Hernandez.  The questioning ended when Ortega requested to hear recordings of the phone conversations.  At that point, the agents transferred Ortega from Keyes, Oklahoma to the Ford County Jail and Sheriff's Office in Dodge City, Kansas.

Upon arrival, the agents took Ortega straight to an interview room, where they removed his handcuffs placed on him for transit and let him take a seat in a chair.  Anthony Lopez, a Detention Officer for the Ford County Sheriff's Office, joined the agents to serve as an interpreter.  Mr. Lopez is bilingual—fluent in both English and Spanish—but he has never been certified as a translator or interpreter.  After Ortega was processed, the agents initiated a recording of the interview.  The questioning began when one of the agents began playing back the phone conversations between Ortega and Alaniz-Hernandez that the DEA had recorded.  It is undisputed that the agents did not re-administer Ortega's *Miranda* rights prior to, or during this conversation.

During the questioning, there were two words that Lopez could not easily translate: "ounces," and "calves."  Lopez testified that he did not know how to say those words in Spanish,

but Ortega knew the words Lopez was trying to say, so the problem was quickly resolved. Besides those two words, however, Lopez indicated that he had no trouble communicating with Ortega.

Special Agent Brown and Detention Officer Lopez both testified that at no point during the interview did Ortega say anything, or make any indication, that he wanted to end the conversation. Lopez described Ortega's behavior as "extremely cooperative, actually. He was relaxed throughout the entire interview." A video recording of the interview confirms that Ortega appeared to be calm and relaxed. After questioning Ortega for approximately thirty-five minutes, the agents stopped the interview on their own accord. Special Agent Brown testified that they stopped the interview because they did not feel that Ortega was being truthful with them.

At the hearing, Ortega chose to testify. He told a slightly different story—namely, that he did not understand Serna when she was reading him his rights at the Keyes police station. Ortega testified that he said he remembered "she was reading some stuff," but he "did not understand that well." Ortega explained that sometimes he "gets embarrassed" when he does not "understand that well," but he does not "like to ask them to say it again." He contends that the reading of his *Miranda* rights was one such instance when he did not understand, but was too embarrassed to ask Serna to repeat herself.

While on the witness stand, Ortega stated that he did not know he had a right to not answer the DEA's questions. He thought that if he did not answer their questions, they "were going to accuse [him] of something…" When asked about whether he understood that he had the right to speak with a lawyer, he answered that "yes, they had told me but I didn't know that I

could get one."  Ortega clarified, "I had never been in trouble, I didn't know if I needed to get an attorney or what."

On cross examination, the government asked Ortega whether he understood Serna when she was reading him his *Miranda* rights.  He answered, "Well, no, I understood her but like I'm saying, I didn't understand her correctly, not everything, you know."  The government then specifically asked Ortega if he knew he could have a lawyer present, and Ortega replied: "Yeah, when they told me that I could have one.  But I didn't know that before—just when they offered me…"  The government then asked if Ortega just thought it would be better to go ahead and talk to the agents.  Ortega answered: "Yes.  Yes, that's what I told him right now."

Mr. Ortega also testified to his background and knowledge of American legal proceedings.  He was born and raised in Mexico, where he only completed his education through the sixth grade.  He has lived in the United States for thirteen years, but has only picked up "very little" English.  Finally, he testified that he had never been arrested previously, so he contends he has no knowledge of the "legal system in the United States."

Ortega now seeks to have the statements he made to the DEA suppressed, arguing that he did not "make a knowing and intelligent waiver of his Constitutional Rights," and therefore his "statement was not freely, knowingly, and voluntarily made."

## II.      Legal Standard

In ruling on this suppression motion, the Court must decide whether Ortega voluntarily, knowingly, and intelligently waived his *Miranda* rights after being detained.  The admissibility of a defendant's custodial statements to investigators is governed by the Due Process Clause of

the Fourteenth Amendment, which examines the voluntariness of the statement,[1] and the Fifth

Amendment, which protects a defendant's right to be free from compelled self-incrimination.[2]

The Supreme Court's decision in *Miranda v. Arizona*[3] sets forth prophylactic measures to guard

against the inherently coercive nature of custodial interrogations.   Specifically, a suspect in

custody must be advised as follows:

> He must be warned prior to any questioning that he has the right to remain silent,
> that anything he says can be used against him in a court of law, that he has the
> right to the presence of an attorney, and that if he cannot afford an attorney one
> will be appointed for him prior to any questioning if he so desires.[4]

Even if the accused chooses not to invoke his right to remain silent, statements made

during custodial interrogations are inadmissible at trial unless the suspect "in fact knowingly and

voluntarily waived *[Miranda]* rights" when making the statement.[5]   The U.S. Supreme Court, in

*Berghuis v. Thompkins*,[6] has noted that the waiver inquiry "has two distinct dimensions."[7]   First,

the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice

rather than intimidation, coercion, or deception."[8]   Next, the waiver must be "made with a full

---

[1] *See Dickerson v. United States*, 530 U.S. 428, 433 (2000).

[2] *See* U.S. Const. amend. V (stating that no "person shall…be compelled in any criminal case to be a
witness against himself").

[3] 384 U.S. 436 (1966).

[4] *Id.* at 479.

[5] *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

[6] 560 U.S. 370 (2010).

[7] *Id.* at 382 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

[8] *Id.*

awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[9]

The government must prove by a preponderance of the evidence the validity of a suspect's *Miranda* waiver.[10]  To demonstrate a valid waiver, the government does not need to produce an express, formal, or written waiver.[11]  "The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel."[12]  Thus, the government can establish that the suspect implicitly waived *Miranda* rights by showing—based on all of the circumstances[13]—that (1) the suspect received a *Miranda* warning, (2) the suspect understood the warning, and (3) the suspect made an uncoerced statement to investigators.[14]

### III.    Analysis

In this case, Ortega does not challenge the content of the *Miranda* warning he received. Instead, he argues that he did not understand or voluntarily waive his *Miranda* rights.  The Court will consider these two arguments in turn.

#### A.  Ortega Understood his *Miranda* Rights

When deciding whether a suspect understood a *Miranda* warning, the Tenth Circuit has considered factors such as whether the suspect acknowledged he understood his rights, whether

---

[9] *Id.* at 382–83.

[10] *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

[11] *See Thompkins*, 560 U.S. at 383 ("[W]aivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered.").

[12] *Id.*

[13] *See Butler*, 441 U.S. at 373.

[14] *Thompkins*, 560 U.S. at 384.

he expressed an inability to understand the discussion, and whether he answered in a manner that was appropriate and responsive.[15]   The Court will find that a defendant sufficiently understood his *Miranda* rights so long as he understood the "substance" or "essence" of his *Miranda* rights.[16]

The testimony and evidence offered at the hearing show that Ortega sufficiently understood his *Miranda* rights prior to waiving them.   First, Ortega acknowledged that he understood his rights—both while Serna was reading his rights to him, and immediately after she had provided them all to him.   While Serna was reading Ortega his rights, she saw him making eye contact and moving his head, which indicates that he was listening and understanding what she was telling him.   Once she had read each of his *Miranda* rights to him, she asked if he understood, to which he replied "yes."   Based on these facts, the government has shown that Ortega sufficiently understood his rights.[17]

Next, at no point did Ortega give any indication that he was unable to understand the information Serna was conveying to him.   Ortega testified at the hearing that he "did not understand that well," but he failed to provide an explanation as to why he was unable to fully understand Serna, who has also spoken Spanish for her entire life.   Besides Ortega's testimony,

---

[15] *See Matthews v. Bonner*, 605 F. App'x 741, 742–43 (10th Cir. 2015) (holding that suspect understood his *Miranda* rights when he acknowledged he understood his rights, did not express an inability to understand the discussion, and answered in a manner that was appropriate and responsive).

[16] *United States v. Bustillos-Munoz*, 235 F.3d 505, 517 (10th Cir. 2000) (holding that *Miranda* waiver was knowing and intelligent because imperfect translation into a language which defendant understood still conveyed the substance of the rights waived); *see also United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir. 1996) (holding that "possible confusion between different translation of the word 'si' " in *Miranda* warning was insufficient to show that suspect's *Miranda* warning was invalid because the warning "sufficiently conveyed to him the 'substance' or 'essence' of his *Miranda* rights . . . ").

[17] *See United States v. Yilmaz*, 508 F. App'x 49, 52–53 (2d Cir. 2013) (finding that suspect sufficiently understood his *Miranda* rights when the ICE agent asked the suspect whether he understood the warning, and the suspect "nodded his head up and down or responded 'yes' " after each right was read to him).

all of the other evidence indicates that he never expressed an inability to understand the discussion.  Serna testified that she did not believe Ortega had any problems communicating with her.  Special Agent Brown, who watched the exchange, testified that "they were having open communication."

In fact, the only indication whatsoever that Ortega had trouble communicating with either of the interpreters came during the second interview in Dodge City.  During that interview, there were two words that Lopez could not easily translate: "ounces" and "calves."  Lopez testified that he did not know how to say those words in Spanish, but Ortega knew the words Lopez was trying to say, so the problem was quickly resolved.  Besides those two words, however, Lopez indicated that he had no trouble communicating with Ortega.  During the first interview, there was no evidence that Serna had trouble communicating with Ortega whatsoever.  Thus, the Court finds that Ortega did not provide any indication that he did not understand his *Miranda* rights.

Finally, the Court finds that Ortega answered in a manner that was appropriate and responsive.  After Serna read Ortega his rights, she asked if he understood, to which he replied: "yes."  When Serna asked Ortega if he was willing to answer some questions, he answered: "I have nothing to hide, I have done nothing wrong."  When Ortega was told that the DEA agents had recorded some of his phone conversations, he responded that he "wanted to hear the recordings."  Accordingly, the Court finds that Ortega's answers were appropriate and responsive.

All of the above factors indicate that Ortega received and understood his *Miranda* rights when they were read to him.  Thus, the Court turns its analysis to whether Ortega voluntarily waived those rights.

### B.  Ortega Voluntarily Waived his *Miranda* Rights

The Due Process Clause requires courts to ensure that a defendant's will was not "overborne by the circumstances surrounding the giving of a confession."[18]  The Tenth Circuit "assesses voluntariness of a suspect's waiver of his *Miranda* rights by examining the totality of the circumstances" and such factors as the length of the detention and interrogation, including the use of threat of physical force.[19]

Ortega contends that he did not waive his *Miranda* rights because he did not understand the rights as they were being read to him.  Assuming Ortega's allegation is true, he nevertheless elected to speak with the agents after Serna read him his rights.  Specifically, when asked if he was willing to answer some questions, Ortega stated: "I have nothing to hide, I have done nothing wrong."  He then proceeded to answer the agents' questions.  As the Supreme Court stated in *Thompkins*, answering an investigator's question is "a course of conduct indicating waiver."[20]  Therefore, Ortega waived his rights by speaking freely and openly with the agents.

The Court also concludes that Ortega's waiver was voluntary.  Without elaborating, Ortega alleges in his motion to suppress that his "statements were not voluntary."  But the testimony provided at the hearing does not support this conclusory assertion.  Ortega was unrestrained during both interviews, and he did not show any signs of distress or appear uncomfortable.  Detention Officer Lopez described Ortega's behavior as "extremely cooperative, actually.  He was relaxed throughout the entire interview."  Special Agent Brown, Lopez, and Serna all testified to the fact that the agents did not use any tactics or posture to intimidate Ortega.

---

[18] *Dickerson*, 530 U.S. at 434 (citation omitted) (internal quotation mark omitted).

[19] *Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004).

[20] *Thompkins*, 560 U.S. at 386.

Furthermore, Ortega never once asserted during his testimony that he was intimidated, coerced, or deceived into answering the agents' questions.  He did state that he thought he "had to answer" their questions, but this mistaken assumption, by itself, is insufficient to show that his waiver was not voluntary.  "So long as petitioner understood the basic principles that he had the right to remain silent and whatever he said could be used against him, his waiver was constitutionally adequate."[21]

In conclusion, Ortega received and understood the *Miranda* warning provided to him.  By answering the agents' questions after reading the warning, Ortega implicitly waived his *Miranda* rights.  The evidence presented fails to show coercive conduct on the part of the government. Therefore, the Court holds that Ortega voluntarily, knowingly, and intelligently waived his *Miranda* rights.

**IT IS THEREFORE ORDERED** that Ortega's Motion to Suppress Statements (Doc. 55) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 8th day of September, 2016.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[21] *Wacker v. Kansas*, 2000 WL 123756, at *3 (10th Cir. Feb. 2, 2000); *see also Colorado v. Spring*, 479 U.S. 564, 574 (1987) ("The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.").